Undersigned Assistant U.S. Attorney has reviewed the entire search warrant package and approves it.
Undersigned Assistant U.S. Attorney has reviewed the entire search warrant package and approves it.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT PFLICK@PREMIUMSERVICEBRANDS.COM THAT IS CURRENTLY LOCATED AT 2211 HYDRAULIC ROAD CHARLOTTESVILLE VA | Case No.  3:24mj00038 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Mark Ericksen, a Special Agent with the Federal Bureau of Investigation being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with the email account pflick@premiumservicebrands.com ("TARGET ACCOUNT") that is currently stored at the Federal Bureau of Investigation ("FBI") Office located at 2211 Hydraulic Road Charlottesville, VA, within the Western District of Virginia.

2.      A search warrant for the TARGET ACCOUNT was previously submitted and approved by the Court on July 24, 2023. This *second* application for a *second* search warrant now seeks to search for and seize additional information concerning ADDITIONAL CRIMES, defined below, from the same TARGET ACCOUNT material previously disclosed by Google in response to the July 24, 2023 search warrant. As further explained below, the TARGET ACCOUNT information to be searched is in the possession of the FBI as Information Disclosed to the Government pursuant to Section I of Attachment B of the July 24, 2023 search warrant for the

TARGET ACCOUNT, but was not seized by the government pursuant to Section II of Attachment B of that search warrant.

3.      Accordingly, I have amended the headings within this search warrant in order to distinguish the information that was included in the prior affidavit from the information that is new and pertains to the ADDITIONAL CRIMES

4.      This affidavit is made in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to allow the government to search the information described in the following paragraphs and in Attachment A.   Government-authorized persons will review that information to locate and seize the items described in Attachment B.

5.       I am a Special Agent of the FBI and have been so employed since January 2020. I attended and graduated the FBI Academy in Quantico, Virginia. During my 20 weeks at the Academy, I received training on federal criminal procedure and investigative techniques to include interviewing witnesses and subjects, physical and electronic surveillance, data analysis, undercover operations, and human source development and operation, among others.

6.      After completing the FBI Academy, I was assigned to the Baltimore Division where I investigated violent crimes, among other violations of the federal criminal code.

7.      I have conducted investigations relating to murder for hire, narcotics trafficking, violent crimes against children, and healthcare fraud, and I have monitored Title III wires.

2

8.      In 2022, I transferred to the Richmond Division and am assigned to a squad that investigates violations of federal law including but not limited to: domestic and international terrorism, violent crime, human trafficking and financial frauds.

9.      The statements contained in this affidavit are based in part on information provided by other federal agents and state law enforcement officers; written reports about this and other investigations that I have received; the results of interviews conducted by law enforcement; independent investigation and analysis by law enforcement agents/analysts; and my experience, training, and background as a Special Agent.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C §§ 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering), 1957 (transactions in property derived from unlawful activity) and 26 U.S.C. §§ 7201 (tax evasion), 7206 (1) (filing false returns), 7206(2) (aiding and abetting in the filing of false tax returns) (together, "ADDITIONAL CRIMES") have been committed by Paul Flick ("FLICK"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## IDENTIFICATION OF THE INFORMATION TO BE EXAMINED

11.     The property to be searched is the information returned by Google pursuant to the July 24, 2023 search warrant seeking information from the TARGET ACCOUNT and deemed

Non-Segregated as that term is defined in the September 28, 2023 Order for Procedure to Protect Privilege and further explained below.

12.      This information is currently located within the possession of the FBI at 2211 Hydraulic Road, Charlottesville.

## **BACKGROUND INFORMATION CONTAINED IN PRIOR AFFIDAVIT**

13.      Premium Service Brands is a Limited Liability Company located in Charlottesville, Virginia, within the Western District of Virginia. The website is: premiumservicebrands.com. Premium Service Brands is a franchisor of nine (9) franchises: 360 Painting, ProLift Garage Doors, Maid Right, Kitchen Wise & Closet Wise, Renew Crew, Rubbish Works Junk Removal, The Grout Medic, House Doctors, and Rooterman. FLICK is the owner and Chief Executive Officer of Premium Service Brands.

14.      AE Capital is a Limited Liability Company located, in Charlottesville, Virginia, within the Western District of Virginia. The website is: aecap.net. The website describes the company as a "boutique private capital firm focused on the home service industry" and lists the email address: pflick@aecap.net and the telephone number: 703-622-0109.

### Paycheck Protection Program

15.      The Paycheck Protection Program (PPP) established by the CARES Act, was implemented by the Small Business Administration with support from the Department of the Treasury.  This program provided small businesses with funds to pay up to 8 weeks of payroll

4

costs including employee benefits. Funds could also be used to pay interest on mortgages, rent, and utilities.

16.     According to treasury.gov, "The Paycheck Protection Program prioritized millions of Americans employed by small businesses by authorizing up to $659 billion toward job retention and certain other expenses. Small businesses and eligible nonprofit organizations, Veterans organizations, and Tribal businesses described in the Small Business Act, as well as individuals who are self-employed or are independent contractors, were eligible if they also met program size standards.

17.     Per a Department of Treasury Fact Sheet reviewed by your Affiant, "PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET: BORROWERS", borrowers were only permitted to take out one loan under the Paycheck Protection Program.

<u>PPP Loan Applications</u>

18.     Between April 4-16, 2020, Premium Service Brands and AE Capital both applied for PPP loans through Bank of America and Citizens Bank, respectively.

<u>Premium Service Brands Application to Bank of America</u>

19.     Between the dates of April 4 and 15, 2020, Premium Service Brands submitted three (3) Paycheck Protection Program loan applications to Bank of America, an FDIC insured institution.  Each application requested $520,383 in loan funding.

20.     The three (3) loan applications were essentially identical with minor differences. Each application listed Premium Service Brands with the Business TIN of 473476328 and the business address of 630 Peter Jefferson Parkway, Suite 200, Charlottesville, Virginia, 22911.

Throughout each application, FLICK was listed with 100% ownership of Premium Service Brands.

21.     On April 3, 2020, the first Premium Services loan application (application reference number (ARN) 4106233942)  was completed and signed by FLICK. The email address pflick@premiumservicebrands.com (TARGET ACCOUNT) was listed on the application under contact information for FLICK.

22.     On April 4, 2020, the second Premium Services loan application, ARN: 4106358521, was completed and signed by FLICK. pflick@premiumservicebrands.com was listed on the application under contact information for FLICK.

23.     On April 15, 2020, the third Premium Services loan application, ARN: 4106941968, was completed and signed by Barbara Myer ("Myer"). Both the email addresses pflick@premiumservicebrands.com and bmyer@premiumservicebrands.com were listed on the application under contact information.

24.     I am unaware of why Premium Service Brands submitted three (3) applications. On May 15 and 20, 2020, Bank of America provided FLICK with two letters stating two of the three (2/3) duplicate applications were being closed.

25.     On all three (3) of the loan applications, including ARN 4106358521, which was ultimately granted, FLICK answered "Yes" to the following: "During the period beginning on February 15, 2020 and ending December 31, 2020, the Applicant has not and will not receive another loan under this program".

26.     On May 1, 2020, Bank of America issued a Promissory Note to Premium Service Brands confirming the loan amount of $370,117.00.  On May 4, 2020, a Bank of America

6

account ending in 2757 ("AE Capital Account") received a deposit of $370,117.00 with the

description: "CARES ACT PAYCHECK PROTECTION PROGRAM DEPOSIT".   This

account was titled in the name of AE CAPITAL, LLC.

## TARGET ACCOUNT

27.     Pursuant to a federal grand jury subpoena, Google returned the following

subscriber information for pflick@premiumservicebrands.com: Google Account ID:

550332403578, Name: Paul Flick, Email: pflick@premiumservicebrands.com, Additionally, the

alternate emails pflick@aecap.net and info@aecap.net were connected to this Google account

ID.  The account recovery telephone number was listed as 703-622-0109, the same telephone

number listed for FLICK on aecap.net.

### AE Capital Application to Citizens Bank

28.     On April 16, 2020, FLICK utilized "DocuSign[1]" with email address:

pflick@aecap.net to sign and submit a PPP loan application to Acclivity Financial (a subsidiary

of Citizens Bank) for AE Capital, requesting $520,383 in loan funding.  As discussed above, this

is the same amount FLICK applied for through Premium Services Brands.

29.     The application also listed AE Capital as located at 630 Peter Jefferson Parkway,

Suite 200, Charlottesville, Virginia, 22911, the same address and suite as Premium Service

---

[1] Per DocuSign's website: Document-signing software is technology that lets you sign
documents online. It uses an electronic signature and requires no paper or printing, scanning or
faxing of documents. DocuSign eSignature is document signing software that allows the user to
legally—and securely—collect approvals online.

Brands. The application listed FLICK as the 100% owner of AE Capital. FLICK was designated as the primary contact for the loan application and listed the email address pflick@aecap.net.

30.     AE Capital is listed as the 100% member of Premium Service Brands as well as the 100% member of other entities.

31.     On the Citizens Bank Borrower Application Form for AE Capital, FLICK electronically signed his initials, confirming "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program."

32.     A federal grand jury subpoena was served on GoDaddy, LLC for the subscriber information for pflick@aecap.net.  Responsive information was received on June 6, 2023 confirming  FLICK as the subscriber.[2]

33.     The loan application listed 703-622-0109, the recovery telephone number for the TARGET ACCOUNT.

34.     On April 27, 2020, the Small Business Administration approved loan number 4341027203 authorizing a loan in the amount for $505,255 for AE Capital, LLC.

35.     On April 28, 2020, FLICK utilized DocuSign to sign SBA Form 1050, U.S. Small Business Settlement Sheet, acknowledging and confirming SBA Loan 4341027203 in the amount of $505,255 for AE Capital, LLC.

36.     On April 28, 2020, the AE Capital Account (i.e., the account into which Bank of America deposited the PPP loan for Premium Service Brands) received a wire transfer deposit of

---

[2] This information was updated since the previous search warrant.

8

$505,255 from Citizens Bank.

37.     On April 22, 2020, Paycheck Protection Program Loan Credit Memorandum was issued which detailed the terms of the AE Capital Loan. The Memorandum detailed the Maximum Loan Amount of $505,255, with an Approved Loan Amount of $505,200. Seventy-five percent (75%) of that loan amount, or $378,900, must be used for payroll while twenty-five percent (25%), or $126,300, must be used for other eligible expenses.

<u>Duplicative Loan Documents</u>

38.     I have reviewed the loan applications for Premium Service Brands and AE Capital and identified examples of duplicative documents used in both loan applications. Furthermore, I have identified identical employees attributed to both companies, during shared time periods. Specifically, Premium Service Brands and AE Capital submitted many of the same federal tax returns, payroll documents, employee ledgers, and lease documents to support their PPP loan applications. In addition, many of the documents submitted in support of AE Capital were attributed to Premium Service Brands and did not bear any markings for AE Capital.  In addition, the AE Capital loan application did not include new documents showing additional employees or leases for the other companies that AE Capital wholly owned.

39.     More specifically, seven (7) identical documents tax documents were identified in both PPP loan applications. The first document was a sixty-five (65) page tax package compiled for Premium Service Brands by S&W Payroll Services LLC, 1155 Highway 190, E Service Road, Suite 200, Covington, Louisiana. The Company Package contained copies of tax returns

filed on behalf of Premium Service Brands for Quarter 3, 2020. The identical information was submitted for AE Capital.

40.     The same five (5) Quarterly Federal Tax Returns in the name of Premium Service Brands were also submitted for both Premium Service Brands and AE Capital (federal tax returns for Quarters 1-4 of 2019, and Quarter 1 of 2020). In addition to duplicative federal tax returns, Premium Service Brands and AE Capital both submitted identical Virginia Employment Commission – Employer's Quarterly Tax Reports which listed the same thirty-four (34) Premium Service Brands employees.  (These tax documents listed 34 employees while the loan applications claimed 41; the reason for this discrepancy is not clear.)

41.     Nine (9) identical lease documents were identified in both PPP loan applications. Four (4) of the documents contained lease and sublease packages/agreements between PJP Properties and Premium Service Brands. In addition to the duplicative lease documents, five (5) identical sublease invoices for April through August of 2020 ($5,602.42/month) were submitted for both Premium Service Brands and AE Capital PPP loan applications.

42.     The email address pflick@aecap.net was also provided on the lease documents for Premium Service Brands lease agreement.

43.     The two PPP loan applications also included ten (10) identical payroll documents. Additionally, many other documents submitted reflected the same information in differing format; therefore, not identical, but representing the same material information.

44.     I reviewed copies of checks submitted for Premium Service Brands and identified twenty-one (21) identical checks submitted to both Bank of America and Citizens Banks in the two PPP loans. The checks were dated after the original PPP loan application. For this reason, I

10

believe the checks were submitted to support loan forgiveness applications, and not the original applications.

45.     On February 21, 2023, I interviewed Scott Hammerbacher, Senior Vice President of Loan Administration at Citizens Bank. Hammerbacher spoke with the underwriter of the loan who explained that the AE Capital loan was approved for AE Capital, utilizing Premium Service Brands supporting documents, because the Applicant claimed that Premium Service Brands was 100% owned by AE Capital. Hammerbacher stated that if the bank had been made aware that the Premium Service Brands supporting documents had previously been submitted for a separate PPP loan, it would have affected the approval of the AE Capital PPP loan. Using the same supporting documents to receive separate loans would be considered duplicating applications.

PPP Loan Forgiveness

46.     Per the Treasury Department's website, The SBA implemented a PPP loan forgiveness for borrowers. The program outlined that borrowers may be eligible for loan forgiveness if the funds were used for eligible payroll costs, payments on business mortgage interest payments, rent, or utilities during either the 8- or 24-week period after disbursement. A borrower could apply for forgiveness once it had used all loan proceeds for which the borrower was requesting forgiveness. Borrowers could apply for forgiveness any time up to the maturity date of the loan. If borrowers did not apply for forgiveness within 10 months after the last day of the covered period, then PPP loan payments are no longer deferred, and borrowers were required to begin making loan payments to their PPP lender.

47.     Borrowers were required to produce i) bank account statements or third-party payroll service provider reports documenting the amount of cash compensation paid to

11

employees ii) tax forms (or equivalent third-party payroll service provider reports) for the periods that overlap with the Covered Period or the Alternative Payroll Covered Period and iii) payment receipts, cancelled checks, or account statements documenting the amount of any employer contributions to employee health insurance and retirement plans that the borrower included in the forgiveness amount. Borrowers were also required to produce non-payroll documentation such as rent, lease, and mortgage statements.

## BACKGROUND CONCERNING GOOGLE[3]

48.     Google is a United States company that offers services to the public through its Google Accounts, a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

49.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops,

---

[3] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com. **As explained, the information to be searched is already in the Government's possession but was previously provided by Google.**

mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

50.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

51.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

52.     Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google.  Gmail can be accessed through a web browser or a mobile application.  Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user.  Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

53.     Based on my experience and understanding, Google provides services for business email accounts, called Enterprise Accounts. These accounts offer increased functionality and controls for business owners. In the case of enterprise accounts, Google typically requires the government request preservation or serve legal process directly from/to the enterprise. Premium Service Brands is an enterprise account. Typically, Google requires that law

enforcement directly contact the enterprise account holder to serve legal process. Google requires that if the government cannot contact the enterprise directly, they must explain the reasons and factual circumstances why law enforcement cannot do so and why an appropriate official at the enterprise cannot be notified.  I have notified Google and provided them with the factual circumstances of the investigation and Google acknowledged the factual circumstances and preserved records associated to pflick@premiumservicebrands.com.

54.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.  Android device users can also use Google Drive to backup certain

data from their device. Android backups on Google Drive may include mobile application data, device settings, file downloads, and SMS messages.

55.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

56.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

57.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account

via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

58. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

59. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  For example, email messages sent, received, and saved; and any content that FLICK or other individuals made regarding the activity (which may, in turn show their state of mind in connection with the offenses under investigation).

60. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the

offenses under investigation.  For example, the emails may contain the names and email addresses of individuals communicating with FLICK in furtherance of the offenses under investigation.

61.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

62.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

63.     Other information connected to the use of a Google account may lead to the discovery of additional evidence.  For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to

communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

64.     Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services to receive, send, and/or upload documents in connection with the offenses under investigation.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## GOOGLE AND GO DADDY RETURNS REVIEWED PURSUANT TO PRIOR SEARCH WARRANTS[4]

65.     On September 12, 2023, Google returned information in response to a search warrant for the TARGET ACCOUNT.  On September 20, 2023, pursuant to a separate search warrant, GoDaddy also returned information in response to a search warrant for pflick@aecap.net.

66.     Upon receipt of these two search warrants return, the United States discussed a privilege review protocol with counsel for FLICK and agreed to a privilege review protocol.  The United States moved for entry of an Order For Procedure To Protect Privilege ("the Order").  Pursuant to that order, the Google and GoDaddy search warrant returns were reviewed by FLICK's counsel and segregated into two categories: Segregated (privileged) Material and Non-

---

[4] This section is the start of information not included in the prior search warrant.

18

Segregated (non-privileged) Material.  The Non-Segregated Material was returned to your Affiant for review.

67.     Your Affiant then searched the returned, Non-Segregated Material for emails that could be properly seized under Section II of Attachment B of the Google search warrant and GoDaddy search warrant that the Court issued on July 24, 2023 and August 11, 2023, respectively.[5]

68.     Your Affiant did not review every email within the Non-Segregated Material, but instead used search parameters designed to identify emails reasonably attributed to the PPP loan process and items as detailed in Section II of Attachment B. Your Affiant—utilizing the advanced search function in an eclipse database—used a combination of keywords, date ranges, and custodians relevant to the PPP loan process to search for and identify material the government was permitted to seize under the two above-referenced Section II of Attachment Bs. While reviewing the results of these searches within the Non-Segregated Material, as set forth below, your affiant observed evidence of other potential criminal violations by FLICK in plain view.

69.     Additionally, I have conducted additional investigation and received additional evidence that FLICK committed the ADDITIONAL CRIMES.  In particular, but not limited to, I have received and evaluated bank records for accounts pertaining to the receipt of the PPP loan funds and the accounts  to which that money was sent, as well as interviewed a bookkeeper who

---

[5] Of note, these are the dates that the Court authorized the amended search warrants for Google and GoDaddy.

worked for Premium Service Brands during the time period in which both the PPP loans and forgiveness therefore were applied for.  This additional evidence is also described below.

70.     Given the material viewed in plain sight as well as the additional material received in response to my continued investigation, there is now probable cause to believe the TARGET ACCOUNT will contain evidence or instrumentalities of the ADDITIONAL CRIMES and this search warrant seeks authority to search for, review and seize additional material from the TARGET ACCOUNT, using the Non-Segregated Material already in the Government's possession.

## PROBABLE CAUSE AS TO ADDITIONAL CRIMES

71.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of  18 U.S.C §§ 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering), 1957 (transactions in property derived from unlawful activity and 26 U.S.C. §§ 7201 (tax evasion), 7206(1) (filing false returns), 7206(2) (aiding and abetting in the filing of false tax returns) (together, "ADDITIONAL CRIMES") have been committed by FLICK. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes.

### PPP Funds Deposited and Used

72.     As described above, on or about April 28, 2020, Bank of America account number 3830 1624 2757, defined above and referred to herein as the "AE Capital Account" received a wire transfer in the amount of $505,255.00 from Citizens Bank for a Payment Protection Program (PPP) loan, located at 300 Broad Street, Elizabethtown, Tennessee.  The AE Capital Account is registered to AE Capital, LLC EIN: 47-3475563, and FLICK is listed as the

20

only member on this account.[6]   Prior to that wire transfer, the AE Capital Account balance was approximately $5,376.36.

73.     On or about April 29, 2020, FLICK initiated a $500,000.00 funds transfer from the AE Capital Account to USAA bank account 0233964428 ("FLICK Personal Account"). According to subpoena returns provided by USAA, the FLICK Personal Account is a USAA Classic Checking account registered to FLICK, individually. After FLICK made the $500,000.00 wire transfer to USAA, the AE Capital Account returned to an account balance of approximately $9,408.56.

74.     On or about April 29, 2020, after completing the funds transfer from the AE Capital Account to the FLICK Personal Account, FLICK transferred $500,000.00 to USAA Investment Management Company (IMCO) account RNQ801450 ("FLICK IMCO Account").

75.     IMCO, also referred to as "ISCO," is a direct, wholly owned subsidiary of USAA Investment Corporation and an indirect, wholly owned subsidiary of the United Services Automobile Association ("USAA"), a diversified financial services organization. ISCO has been in the investment services and advisory business since 1970. Prior to May 26, 2020, and under the name USAA Investment Management Company ("IMCO"), ISCO operated a full-service broker-dealer and investment advisory business, serving retail and institutional clients. On May

---

[6] Forensic analysis of the AE Capital bank account identified numerous transactions that were reasonably attributed to personal expenses and unrelated to businesses or investments. The AE Capital Account funded transactions related to personal credit card payments, BMW vehicle financing, landscaping, and jewelry purchases. The analysis identified limited transactions attributed to business or investments. However, known employees of Premium Service Brands were paid from the AE Capital Account on an irregular basis and in large sums, potentially as bonuses.

26, 2020, ISCO's brokerage and advisory businesses, including client accounts, were sold to Schwab Holdings, Inc., an affiliate of Schwab. ISCO no longer (1) performs investment management services, (2) maintains client accounts, (3) offers securities or investment products, or (4) recommends specific securities or investment products. ISCO's business is now limited to referring prospective investors to Schwab or Victory Capital, performing certain referral-related marketing activities, and providing advice with respect to saving for retirement and retirement income.

76.     On or about May 1, 2020, FLICK transferred approximately $50,000 total in three (3) transactions from the FLICK IMCO Account to USAA IMCO accounts RNQ007271, RNQ031729, and RRU756113. According to subpoena returns provided by USAA, IMCO accounts RNQ007271, RNQ031729, and RRU756113 are all investment accounts held for the benefit of FLICK's son, daughter, and FLICK himself, respectively.

77.     Also, on or about May 4, 2020, FLICK transferred $40,000 from the FLICK IMCO Account to the FLICK Personal Account.

78.     On or about May 4, 2020, $310,225 worth of securities were purchased through the Primary IMCO Account. On or about May 14, 2020, an additional $97,307 worth of securities were purchased through the Primary IMCO Account.

79.     Between April 29 and May 4, 2024, the AE Capital Account remained at the balance of $9,408.66.

80.     As also described above, on or about May 4, 2020, the AE Capital Account received another wire transfer in the amount of $370,117.00. This wire transfer is annotated with

the description: "CARES ACT PAYCHECK PROTECTION PROGRAM DEPOSIT" and corresponds to the Premium Service Brands PPP loan provided by Bank of America.

81.     Also on or about May 4, 2024, $370,117.00 was transferred via wire from the AE Capital Account to a Bank of America account ending in 2702 ("Premium Service Account"), which is attributed to Premium Service Brands LLC. From May 4, 2020 onward, the activity in the Premium Service Account was consistent with typical business account activity, including tax payments to state and local entities, payroll disbursements, business software expenses, and advertising expenses.

82.     After the transfer to the Premium Services Account, the AE Capital Account balance returned to $9,408.66.

*Premium Service Brands Loan Forgiveness Application*

83.     On or about December 17, 2020, Premium Service Brands completed the Bank of America PPP Loan Forgiveness application. Premium Service Brands provided numerous unemployment checks, lease information, and rental payments to convey that the funds were used appropriately. In total, $1,019,713.12 was claimed as payroll costs for Premium Service Brands, with a requested forgiveness amount of $370,117.

84.     In the forgiveness application, FLICK was identified as the authorized representative of Premium Service Brands, LLC, the borrower, and certified that:

a.   The dollar amount for which forgiveness is requested was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments.)

b.   FLICK understood that if the funds were knowingly used for unauthorized

purposes, the federal government may pursue recovery of loan amounts and/or

civil or criminal fraud charges.

*AE Capital, LLC Loan Forgiveness Application*

85.     On or about December 16, 2020, FLICK emailed Mike Callaghan, Senior Vice

President, Director of Technology at Citizens Bank to confirm that the AE Capital PPP loan

forgiveness application was received:

   a.   December 16, 2020 at 1:49 PM Paul Flick [pflick@aecap.net] wrote:

        "*Mike, I hope you are doing well! Barbara Myers just processed the PPP loan
        forgiveness application. When she hit submit button she claims the screen did not
        change. Can you confirm it has been received? Thanks!*"

   b.   December 16, 2020 at 2:16 PM Mike Callaghan wrote:

        "*I am not showing the PPP application as being submitted on my end. If Barbara
        needs any help she is more than welcome to contact me/Ashton directly.*"

86.     Barabara Myer and Mike Callaghan then began to coordinate a telephone call in

order to process the PPP loan forgiveness application.

87.     On or about January 22, 2021, Barbara Myer successfully submitted the AE

Capital PPP loan forgiveness application to Citizens Bank. In the forgiveness application, Myer

submitted many documents that were identical to the documents submitted to Bank of America

for the Premium Service Brands loan forgiveness.  These documents included unemployment

checks, lease information, and rental payments.

88.     In total, $1,018,581.32 was listed as payroll costs for AE Capital, with a requested

forgiveness amount of $505,255.

89.     Barbara Myer ("Myer") initialed "BEM" on the AE Capital loan forgiveness

application, certifying that the dollar amount for which forgiveness is requested was used to pay

costs that are eligible for forgiveness (i.e., payroll costs to retain employees, business mortgage interest payments, business rent or lease payments, or business utility payments). Myer was interviewed on April 24, 2024 and told your Affiant that FLICK directed her to complete the forgiveness application and make certifications stating that the loan funds were used for authorized purposes.

90.    As of January 22, 2021, $500,000 of the $505,255 PPP loan deposited into the AE Capital Account had been transferred to FLICK's private accounts and used to purchase securities

91.    Myer reported believing that her actions were permitted under PPP guidelines.

92.    In addition, to the specific use of the TARGET ACCOUNT and the pflick@aecap.net email account described above, I know from my training an experience that persons working in business use their email addresses to communicate internally and externally about company finances, loans, taxes, and accounting issues.

<u>Probable Cause of Tax Evasion</u>

93.    On or about April 24, 2024, Myer, the former bookkeeper of Premium Service Brands, was interviewed and disclosed to investigators that FLICK was not paying taxes so that he could keep his company afloat. Myer also observed that it appeared like FLICK was always using new accountants to prepare his taxes or audit the company.

94.    During the previously described advanced searches within FLICK's email accounts, your Affiant observed numerous CPAs and accountants that FLICK used to prepare his taxes. Within emails discussing PPP loans and others in plain view of this search, FLICK would

be asked questions regarding his tax information and would then provide accountants with the answers.

95.     In my training and experience, those trying to evade accurate tax assessments will often seek out new tax preparers from year to year in order to silo information and prevent the tax preparer from discovering any efforts to obfuscate illegal activity. By introducing new tax preparers, the client is then in control of the information that is provided to the IRS.

96.     Additionally, while utilizing the advanced search function described above including a date range query for 2020 (i.e., the same year that FLICK applied for PPP loans for Premium Service Brands and AE Capital) your Affiant observed an email chain dated October 8, 2020. This email conversation between FLICK from the TARGET ACCOUNT

Case 3:24-mj-00038-JCH   Document 1-1   Filed 07/19/24   Page 27 of 35   Pageid#: 32

[pflick@premiumservicebrands.com] and Brian Alas [balas@boxwoodpartners.com] [7], subject line "Re: August financials and owner equity detail," contained the following:

a. October 8, 2020 at 3:21 PM Brian Alas [balas@boxwoodpartners.com] wrote:

"*PF – to confirm, none of your compensation is currently in the P&L? Does Katie or accountant make any adjustments to put in a salary (W2 income) in the P&L for tax purpose?*"

b. October 8, 2020 at 3:22 PM Paul Flick [pflick@premiumservicebrands.com] wrote:

"*No there is not and no.*"

c. October 8, 2020 at 3:25 PM Brian Alas [balas@boxwoodpartners.com] wrote:

"*Not sure how that be? IRS requires [some] sort of salary to be included in P&L for tax purpose so you don't escape all payroll taxes.*"

d. October 8, 2020 at 3:31 PM  Paul Flick [pflick@premiumservicebrands.com] wrote:

"*In a partnership it's not required.*"

97.     On or about June 9, 2023, your Affiant received IRS tax records for FLICK pursuant to an ex parte order issued in the Western District of Virginia. The IRS records detailed FLICK's personal and business tax filings for 2015 through 2022. Your Affiant reviewed the records and identified disparities between FLICK's Adjusted Gross Income (AGI) and personal expenses being paid through the AE Capital Account.

98.     In tax year 2018, FLICK claimed $269,073 as his AGI.   In this tax year, the AE Capital Account has a substantial number of debits that appear to be FLICK's personal spending.

---

[7] Boxwood Partners is a merger and acquisition firm that provides a broad range of advisory services to select clients in the middle market.

These apparently personal debits include: credit card payments made to FLICK's and his wife's personal credit cards totaling $89,967.78,[8] general home expenses totaling $340,529.73, $13,135.48 paid to Glenmore Country Club, $29,988.34 paid to A.B. for the mortgage on FLICK's current residence, and a $1,350.98 fee paid to the Glenmore Community Association. These debits are clearly personal expenses yet were paid from the AE Capital Account. These debits total $474,972.31— $205,899.31 greater than FLICK's reported AGI in 2018.

99.    In tax year 2019, FLICK claimed $593,085 as his AGI.  In 2019, there were a substantial number of debits from the AE Capital Account that appear to be FLICK's personal spending.  These apparently personal debits include: credit card payment made to FLICK's and his wife's personal credit cards totaling $66,114.09, general home expenses totaling $305,119, transfers to accounts in the name and for the benefit of FLICK's children and wife totaling $39,500.00, loan payments totaling $81,621.90 which included vehicle payments to BMW and a loan in the name of FLICK's wife, retail charges (including home furnishings, clothing, and jewelry retailers) totaling $81,346.14, and $57,976.68 paid to A.B. for the mortgage on FLICK's current residence. These debits are clearly personal expenses yet were paid from the AE Capital Account. These debits total $631,677.81—$38,592.81 greater than FLICK's reported AGI in 2019.

100.    FLICK's personal tax filing up to and including tax year 2018 contained a schedule C "Profit or Loss from Business" to report AE Capital business activity. Starting in 2019, although

---

[8] All monetary figures in this section are to be read beginning with "approximately."

AE Capital continued to conduct financial transactions, there are no tax filings accounting for its business activity.

101.    In tax year 2020, FLICK claimed $348,630 as his AGI.  In 2020, there were a substantial number of debits from the AE Capital Account that appear to be FLICK's personal spending.   These apparently personal debits include: personal credit card payments made to FLICK's and his wife's personal credit cards totaling $211,670.37, general home expenses totaling $119,134.53, payments to A.B. for the mortgage on FLICK's residence totaling $57,967.68, transfers to accounts in the name and for the benefit of FLICK's children and wife totaling $76,000.00, and $510,000.00 transferred to the USAA Flick Personal Account. These debits are clearly personal expenses yet were paid from the AE Capital Account. These debits total $974,722.58—$626,142.58 greater than FLICK's reported AGI in 2020.

102.    In tax year 2021, FLICK claimed $413,252 as his AGI. In 2021, there were a substantial number of debits from the AE Capital Account that appear to be FLICK's personal spending.   These apparently personal debits include: personal credit card payments made to FLICK's and his wife's personal credit cards totaling $440,020.84, general home expenses totaling $43,441.36, $57,967.68 to A.B. for the mortgage on FLICK's residence, transfers to accounts in the name and for the benefit of FLICK's children and wife totaling $207,000.00, and transfers to FLICK's Personal Account, Primary IMCO Account, and accounts in the name and for the benefit of FLICK's children and wife totaling $4,302,999.00. These debits are clearly personal expenses

yet were paid from the AE Capital Account. These debits total $5,051,428.88—$4,638,176.88 greater than FLICK's reported AGI in 2021.

103.     There is therefore probable cause to believe that FLICK was using funds from the AE Capital Account as income, without reporting the total as his AGI.

104.     In my training and experience, I know that those trying to evade appropriate assessment of their income taxes will often use business or nominee accounts to hide personal expenditures that should have otherwise been claimed as personal income. Based on the disparity between FLICK's expenses that are reasonably attributed as personal expenses and his claimed AGI, there is probable cause that FLICK violated 26 U.S.C. §§ 7201 (Tax Evasion), 7206(1) (Filing False Returns), and 7206(2) (aiding and abetting in the filing of false tax returns).

## CONCLUSION

105.     Therefore, based on the information above, I respectfully submit there is probable cause to believe that the TARGET ACCOUNT was used to facilitate and commit violations of the ADDITIONAL CRIMES and that a search of the information described in Attachment A will reveal the items described in Attachment B, which are evidence, fruits, and instrumentalities of violations of the same. Therefore, I respectfully request that the Court issue the proposed search warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

___*s/Mark Eriksen*_____
Mark Ericksen
Special Agent
Federal Bureau of Investigation

30

Received by reliable electronic means and sworn and attested to by telephone on July ___19___,
2024.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The property to be searched is information associated with pflick@premiumservicebrands.com ("the TARGET ACCOUNT") for the time period January 1, 2018 to May 1, 2023 that was previously disclosed to the United States pursuant to a search warrant and is being stored at the Federal Bureau of Investigation's Charlottesville Resident Agency located at 2211 Hydraulic Road, Suite 201, Charlottesville, VA.

## ATTACHMENT B

### Particular Things to be Seized by the Government

All information or records from the TARGET ACCOUNT described in Attachment A relating to violations of 18 U.S.C §§ 1343 (wire fraud), 1344 (bank fraud), 1956 (money launder), 1957 (transactions in property derived from unlawful activity) and 26 U.S.C. §§ 7201 (tax evasion), 7206(1) (filing false returns), and 7206(2) (aiding and abetting in the filing of false tax returns), occurring after January 1, 2018 including:

  a. Communications or documents related to PPP loan process(es) to include preparatory actions prior to application submission, application submission, and PPP loan forgiveness;

  b. Communications or documents related the receipt of PPP loan funding from financial institutions;

  c. Communications or documents related to the source, location, or use of fraudulent proceeds;

  d. Communications or documents related to correspondence with financial institutions;

  e. Communications or documents related to payroll and employees;

  f. Communications or documents related to rent, mortgage, lease, and other business related expenses;

  g. Communications or documents bearing on the veracity of information provided to financial institutions;

  h. Records relating to who created, used, or communicated with the TARGET ACCOUNT;

  i. Identification of other accounts, domains, IP addresses, and computers owned or controlled by the same individual(s) controlling the TARGET ACCOUNT;

  j. Documents that tend to establish the identity of the person or persons in control of the TARGET ACCOUNT: identification documents (such as driver's licenses or passports), photographs, bills, receipts, vehicle registration documents, statements, leasing agreements, personal address books, calendars, daily planners, and personal organizers;

k.   Communications or documents related to transfers of funds;

l.   Communications or documents related to personal and business tax preparation and/or payment, including but not limited to communications with tax preparers and accountants;

m.   Communications or documents relevant to the financial state/health and business position of Premium Service Brands, LLC, AE Capital, LLC, or affiliated entities;

n.   Communications or documents pertaining to investors in and investments made by Premium Service Brands, LLC, AE Capital, LLC, and affiliated entities;

o.   Communications or documents relevant to FLICK's motive or intent or state of mind as it relates to the crimes under investigation;

p.   Communications or documents reflecting asset purchases, and/or use of monetary funds;

q.   Communications or documents related to the ownership and transfer of assets including but not limited to physical property (i.e. real estate) and bank accounts;

r.   Communications or documents related to investors Susquehanna International Group, Pine Forest, LLC and/or Paula Miller; Perlich, LLC and/or Kevin Miller;

s.   Communications or documents related to the source of funds in the AE Capital Account (as defined in the Affidavit);

t.   Communications or documents related to the use of funds, including but not limited to the use of funds in the AE Capital Account;

u.   Communications or documents related to outside investors, outside investments, or investment funds;

v.   Communications or documents related to the income of Premium Service Brands, LLC, AE Capital, LLC, and affiliated entities;

w.   Communications or documents related to personal finances and personal expenditures and/or the financial activity of Paul Flick and his family members;

x.   Communications or documents related to the nature of the business of Premium Service Brands, LLC, AE Capital, LLC, or affiliated entities;

y.  Any documents evidencing or related to misstatements or omissions to banks, tax preparers, or investors; and

z.  Contextual information necessary to understand the items described in this attachment.